Good afternoon. Good morning. Michael Levine. Good to see you. Appearing on behalf of... Well, you're looking more professorial every year. Thank you, Your Honor. You're looking well. All of you. All of you are looking well. You know this guy? Oh, yeah. He's been around a long time. Not as long as we have. No, longer than you have. We've all been around a long time. Good lawyer, too. Former public defender of Hawaii, right? Your Honor, I'm no longer a public defender. The record is incorrect. But I was, I mean, I'm proud to say I was a public defender for many years. But for the last five years, I've been in private practice. That's all right. But you were the PD in Hawaii. I was the Hawaii Federal Public Defender, Your Honor. Yes. Okay. Thank you. I don't forget too many things. Go ahead. We had a trial together in Los Angeles, Your Honor. I wouldn't have recognized you. You probably wouldn't have recognized me if I hadn't been sitting here. Go ahead. Your Honor, the Hearst survey came out in the middle 1980s. As a matter of fact, it was discussed at a Ninth Circuit judicial conference, I believe, that probably you attended in the 80s. The survey was quite remarkable. It hasn't gotten much attention except in that Serra case that I cited in my brief. But in that survey, it concluded that 50 percent of jurors who had sat on criminal cases still believed that the burden was on the defendant to prove his innocence and had a complete misunderstanding of the principles that underlie the criminal justice system,  With that in mind, Your Honor, I'm asking this Court to reverse this conviction of Mr. Price on the grounds, on the first ground, that the trial court abused its discretion and violated due process of law by not asking the jurors during voir dire, the prospective jurors, whether or not they had any reservations about these fundamental principles, namely the presumption of innocence, the burden of proof, and the right of the defendant not to testify. This was particularly important in this case, and Mr. Delray Price did not testify in his own defense. Now, granted, we have Ninth Circuit precedent in the mid-'80s, the Price case, which appears to hold that it's not an abuse of discretion not to ask these kinds of questions. But Price is distinguishable for the very simple, for two reasons. In Price, at least the judge asked the jurors whether or not they would follow the law, whether or not they disagreed with that law. That was not asked in this case, except with respect to whether or not the jurors would follow the drug laws, even if they disagreed with the law. The judge asked that repeatedly. The prosecutor asked the jurors that on several occasions. And yet the defense was not permitted to ask whether or not the jurors would follow the presumption of innocence, whether or not the jurors would follow the right, the law that a defendant has a right not to testify in his own defense. Second, Price is distinguishable because it did not consider the Hearst survey. The Hearst survey came out after Price, so it couldn't consider it. But nevertheless, Price is distinguishable. The Court does not have to follow it. There's new information now. There's new reasoning. There's new consideration. Price is 30 years old. And now that you have the Hearst survey and you have the distinguishing facts, the Court can say that where a defendant is not going to testify, at the very least the jury should be asked whether or not it understands that a defendant does not have to testify and that if they have any reservations about that principle, they should make it known. How else is a defense attorney supposed to exercise peremptory challenges or challenges for cause? It's not enough to say, as the government has argued, that, well, jurors are presumed to follow the law. Well, how can that be if they don't know what the law is? How can they be presumed to follow something they don't know? Now, the second reason why the Court should reverse this conviction is that the government calls a court that the defendant follows. Excuse me. Excuse me a minute, Your Honor. Yes, Your Honor. I think the clock was set for a 10-minute argument. Isn't this a 20-minute argument? Let me see. Thank you, Your Honor. The day sheet shows 20 minutes. Thank you, Your Honor. The second reason the Court should reverse the conviction is because the district court abused its discretion in allowing and violated due process in allowing  to testify that the client, Mr. Price, had been on parole for five years and that during that time the defendant had never reported any income from employment. Now, that evidence could have come in as in Beck. This Court said in Beck, the person doesn't have to identify himself. He can just say, I know the person in a professional capacity, and the person has never reported any income from employment. By identifying himself as a parole officer, he has, in my view, enormously prejudiced the jury. It's true, as Judge Mossman pointed out, that the parties had already stipulated that Mr. Price was a felon. But there's a difference between being a felon five years earlier and still being on parole five years later. That's pointed out in the case I cite from the Fifth Circuit. When you tell a jury that the person is still on parole even after five years, you create in the minds of the jurors the impression that the man is a recidivist, the man is a menace to society, and there's a real danger that the jury will convict because he's a They'll use any reasonable doubt. They'll turn it against him. It's not enough to say that, well, the jury did acquit on one of the counts. It's true, the jury did, but the jury may have acquitted on all the counts had the information not come in. The government did not need to do this. They did not need to call to have the parole officer identify himself as a parole officer. They did not need to inject that prejudicial fact into this case. The probative value was relatively slight, as Judge Reinhart, I believe you were the author in Hitt and you pointed out, that where the probative value is relatively slight, even modest prejudice is reversible error. And that's what's here. With respect to the sentencing. What happened to Brady? I'm going to get to Brady. Okay, I'll get to it right now. With respect to Brady, we have the defense attorney specifically asking the United States attorney acknowledged, do you have any impeachable evidence? Do you have any bad acts evidence, even if it doesn't amount to a conviction? The prosecutor says, yeah, I have one thing. I have a petty theft conviction. But at the same time, the prosecutor also admits that he knew he had a series that the chief witness, Ms. Phillips, had a series of petty thefts arrests, had a series of false license plates. Well, he didn't know about that, but he knew about the petty thefts, the other arrests. The agent presumably knew about, though the record isn't clear, it's fair to assume that the agent, the case agent, had all of the traffic violations. In any event, what we did find out was that there was an enormous amount of material. Well, I think the prosecutor said he didn't know whether the case agent had seen the records of that or not. He just wasn't sure. That's true. Is there an obligation of the prosecutor to find out from the case agent? Yes. I believe there is under Kiles v. Whiteley and under the Supreme Court's line. In this Court's line of cases, the obligation is on the prosecutor to find out specifically. Specifically here, not only was there a request in writing, there was a specific oral request to the U.S. attorney. And I think under those circumstances, yes, you can impose an obligation on the United States attorney to check with the agent and say, look, run this person's record, run this person's record, get me all the things you can on this witness. There's been a specific request for that by the defense counsel. And look what happened. This is very unusual. Very unusual situation. Look what happened at the next trial where the defendant, in fact, is able to get a hold of this information, and it's all in the excerpt of record, and impeaches the same witness, Ms. Phillips, impeaches her very strongly, and the jury hangs. She's the only witness. It's credibility again. Only there it's whether or not the defendant's brother made a threat against her. But the jury hangs, and then there's a prosecutor chooses to breach a plea bargain of time served. And an enormous benefit, very unusual where we can actually say, in my view, it made a difference. So here it clearly made a difference. No speculation is involved. This was a Brady violation of the first order. With respect to the sentencing, I'll submit the matter. If there are any further questions, I'll be happy to answer them. Thank you. Ms. Phillips. May it please the Court, counsel. Kelly Zusman appearing on behalf of the United States. As you're aware from Mr. Levine's opening, there are four issues with this appeal. The first is the voir dire. You'll have to speak on that. Oh, yes, sir. The first is the voir dire. This falls within the district court's discretion. I think Price and Johnson both control. Judge Mossman did, in fact, instruct the jury both prior to the beginning of trial and his preliminary instructions and at the end of trial about the presumption of innocence. And also, were there to ever be a case in which this issue would be questioned, I would suggest this is not the case, because clearly the jury here was aware of the presumption of innocence and not to infer anything negative from a defendant's acquitted of the two most serious charges here, and that is possession with intent to distribute marijuana and the 924C count. The next issue is the admission of Carl Green's testimony. Mr. Green was the defendant's state parole officer. Here again, Judge Mossman did not abuse his discretion. In the record, he carefully balances under 403 the prejudice and the probative value, determines that based upon the defendant's stipulation, the prejudice here is very minimized. Mr. Green's testimony was offered for the limited purpose of trying to explain why it was he had $690 in cash on his person at the same time that the nine baggies of marijuana were found. Now, obviously, that did not have a bad impact on the jury because he was acquitted of the possession with intent to distribute. The next issue, the Brady violation. And here, this is where it gets to be. Possession. How much did he have? How much did he have on him? Money or drugs. The marijuana. He had nine baggies, and it was approximately 6.2 grams. 6.2 grams. Correct. All right. That's not very much, is it? No. And he was, in fact, convicted of simple possession. Yeah. And one of his defenses at trial was that he possessed that. Why did you even charge possession for sale? First off, because there were nine separate baggies, which is not suggestive of personal use. Secondly, because of the $690 in cash. Why isn't that suggestive of personal use? Ordinarily, people don't buy separate distribution size quantities. Well, I don't know. You buy cigarettes, you get 20 in a pack. And I can't. Was that quantity any more than the package of cigarettes? By weight? I honestly have no idea how you would equate nine baggies of marijuana with packages or cartons of cigarettes.  How about the weight? 6.2 grams. Again, more than what is typically suggested by a user quantity. If I may then turn to the Brady issue. And this is where it gets to be a little bit. How many ounces is 2.6 grams? Now you're testing my math skills, Your Honor. I don't know exactly how many ounces. You're the government. You're supposed to know everything. There are 28 grams to the ounce, and so approximately a quarter of an ounce. A quarter of an ounce. Just a little tiny bit. For marijuana, though, I would imagine that nine baggies and 6.2 grams could sustain someone for a fairly lengthy period of time. But that's why he was charged, and ultimately he was acquitted of that count. Okay. On the Brady violation, this gets to be a little bit confusing because we've got two separate trials going on here. Mr. Price was tried in April of 2005, and Antoinette Phillips testified at his trial. During the course of the trial, the defendant's brother followed Ms. Phillips and then threatened her. Mr. Muhammad, the defendant's brother, was then tried before Judge King. It did result in a hung jury. Ms. Phillips was the only witness for the government. We have no idea why the jury hung in that case, and I think it's a little bit dangerous to start speculating since the jury simply reaches a verdict one way or the other. Although they didn't reach a verdict here, they hung. After that, Mr. Muhammad pled guilty to count one of the indictments. He was sentenced to time served, which was, in fact, an eight-month sentence. So then we return to Mr. Price's case. He files a motion for a new trial based upon evidence that was gathered by Mr. Muhammad's defense attorney. And here we've got the additional shoplifting arrests, which both Judge King and Judge Mossman ruled were inadmissible. And Judge Mossman also went so far as to say that they were not discoverable, the record of these arrests. They were not convictions. They were for shoplifting. And under this Court's cases, in Ortega... There was a false license plate, or three convictions for false license plates. Right. That's the next issue, which is the false tags. Those were traffic citations. And if you look at the record, at ER 50, that's a copy of one of those citations. You'll see at the top where it says either violation or a criminal violation. And in each instance, it's checked it's simply a violation. It's an infraction. It's not even a misdemeanor. Also, you may know... Are you saying it wasn't admissible? I'm sorry? Are you saying it was not admissible? Yeah. Our position is that it was not admissible. Now, Judge King did allow it for purposes of impeachment of Ms. Phillips. But you'll also notice from that citation at ER 50, there's a box check that Ms. Phillips wasn't even the registered owner of that vehicle. So I think in terms of the value of those citations were very minimal. Now, Judge Mossman determined that he would probably do the same thing that Judge King did. He would probably give the defense counsel the leeway to use those if he chose. But then Judge Mossman made a fact finding. And his finding was that Mr. Walker, the original trial counsel, would not, in fact, have used those. That when Mr. Walker was given evidence of the theft II conviction, he specifically chose not to go there. His trial strategy, which Judge Mossman... Evidence of which conviction? This was the shoplifting conviction, the one that actually ended up in a conviction. But I thought that was inadmissible. It was inadmissible, but... But he said he wouldn't use it. He couldn't have used it. Mr. Walker testified that he thought it was admissible. And Mr. Walker testified that he chose not to attempt to attack her credibility, in part because Ms. Phillips and Mr. Price were friends. His theory at trial was that Ms. Phillips was simply mistaken when she testified that she saw a gun in the defendant's waistband. Mr. Walker's – what he was trying to elicit was that what she was really seeing was a cell phone. It wasn't really a gun. So he – it was never part of his strategy to attack her credibility. And what Judge Mossman said was, look, even if Mr. Walker had had these... But he did say to the judge at the trial, you know, I would like to subpoena the police officer to get the information about those – that record and whether they knew about it, unless the judge thinks it's not really that important. So it does sound like he did want to get the information. But Judge Mossman rejected that. At ER-212, Judge Mossman specifically found that those traffic citations would not, in fact, have altered Mr. Walker's strategy. But how can that be? How can it be when he said he thought he wanted to get it and, you know, unless Judge Mossman thought it was unimportant? And Judge Mossman said, well, you know, I don't think it's important. Because he said, otherwise I'd like a continuance. That's totally inconsistent with the idea that he didn't want it. And Judge Mossman also found that they were minor. I mean, he says that word, that these traffic infractions were such a minor matter that there's no way it could have altered the outcome. Well, that's right. Maybe he was wrong about that. Because, you know, you never know. First of all, what would the harm have been to give this information? Well, first off, we have the testimony in the record from Mr. Edmonds was that he did not, in fact, know about those traffic citations. So this is not a case in which the government has to say the U.S. Attorney. I'm sorry? The U.S. Attorney. That's correct. He said he didn't know whether his witness knew. That's correct. What he explained was that his witness, Detective Anderson, printed out a LEDS report. And in that LEDS report, the only thing that it would show is if someone had read it. And then he was asked whether his witness had reviewed the other reports. And he said, I don't know. It's possible he did. That's correct. So the same question that we asked your opponent, shouldn't the United States Attorney have asked his witness? And the answer to that is no, not for traffic citations. Well, suppose it were murder. I'm sorry? Suppose it were murder. Well, a murder would show up on the LEDS report. Any crimes. The theft to conviction show up. Well, whether it's LEDS or anything else, if he reviewed one set of records and something may be on the other set of records, shouldn't he ask, did you see these various records that the people normally look at? I think what the trial court here held was that we're drawing the line at traffic citations, that if someone is cited for speeding, that's simply never going to be relevant under 608. How do you know that? You don't know that. You don't know what's going to come up in a trial. I mean, that shouldn't be a matter for the prosecutor to decide. It's something that ought to be given to the defendant. You never know. You know, you get a witness up there and say, I have never, you know, blurred out, I've never violated the law, you know. Oh, well, let's see. You never know what's going to happen in a trial. Sometimes a small thing can turn the tide. Here we're talking about evidence that is admissible. You may think it's not very important, but it's admissible and it's grading material. I'm not aware of any authority, nor has any authority been cited for the proposition that the government has an obligation to go follow up on traffic citations. Now, certainly as a regime. What if there were 100 speeding citations? Well, and speeding doesn't go to dishonesty. We're looking at Rule 60. Well, switch plates does. Are you saying that a switch driving around with switch license plates is not a – doesn't show anything about the probity of the witness as to honesty? I don't think it shows anything more than shoplifting does, Your Honor, especially where the citation notes she wasn't the registered owner of the vehicle. Well, she was driving around. Who cares who owned it? If you're operating under false colors, it's false colors, whatever they are. And she was told that and continued to do it until they got her the third time. But for the Brady violation, there's no question that we did not have evidence of those citations in our possession. Well, your agent may have. Your principal witness may have. Whatever your principal witness has, you have. There's no proof here that Detective Anderson had those citations. At most, what he had was a ledge report. We don't know exactly what was in that ledge report. Well, the question is, should you have asked him? And Judge Mossman said no, and I think that was true. Well, that's why we're here. I'm sorry? I said, that's why we're here. It's one of four reasons why we're here, Your Honor. Judge Mossman also said – But, you know, there's a tendency for prosecutors to withhold Brady information and kind of a lack of respect for the Supreme Court authority, too. We see these cases all the time. Your Honor, I would suggest that this is not one of those cases. We had a lengthy evidentiary hearing. Judge Mossman found that there was, in fact, no Brady violation. In fact, the defendant's theory was that this was a negligent non-provision case, not intentional. And he said that several times throughout the record. In addition, Judge Mossman held that even if this had been disclosed, this is merely impeaching. And Ms. Phillips' testimony was corroborated by the testimony of three police officers. She was not the only government's witness. We had three officers who saw the defendant sitting in the back seat of the car with three other individuals. They know that he has an arrest warrant outstanding. It would have impeached her, but you never know what's going to turn a jury's mind sometime. And that's where we need to trust the trial judge. Judge Mossman tried this case. No, no, no. You trust the jury. You trust the jury. It's for the jury to make that decision. But on the new trial motion, it's for the trial judge. See, but the trial judge was – what he said in the new trial motion, he said afterwards, no, I don't think that Anderson is important, and I'll explain why later. And then he never said another word about it. And Anderson was not called as a witness. And I think that's because Judge Mossman determined that these traffic citations were so minor. Yeah. Well, that's a question is, you know, was it in the context of this case, was he correct that that impeachment evidence was of no significance? And that's the issue. Yeah. And the context of this case is very important. We had three police officers testify that as they approached the car that the defendant was riding in, that the defendant ducked down beneath the driver's seat, that he raised up, that he then was pushing on the driver's seat. He's the only one in the car that's moving as they're stopped. He's actually pushing the driver into the steering wheel. He's panicking. Everyone else is sitting there, not moving, not panicking. He's trying to escape from that car. A loaded firearm is found underneath the driver's seat. We know from the front passenger who testified that it was the defendant who was yelling, go, go, go, as the police officers approached. He was the one that was riding in. Well, he had marijuana on him. I'm sorry? He had marijuana on him. Obviously, he was committing what the government considered to be a serious offense. And when they tried him for possession with intent to sell, no wonder he was concerned about the police closing in. And the defendant is the only one who actually ducks underneath the driver's seat and appears to be putting something under there, which is exactly where the gun was found. We also know from Rebecca Jones, who was the front seat passenger, that the defendant, his theory at trial was that the gun belonged to Rosie Lewis, who was driving the car. And Rebecca Jones testified that Ms. Lewis, she had been with her for five years. She had never seen her in possession of a firearm. She didn't believe Ms. Lewis knew anything about a firearm. So we have a strong case based upon the observations of the officers and based upon Ms. Jones' testimony. Ms. Phillips was additional corroboration, and these traffic citations were merely one piece of potential impeachment. Judge Mossman, who sat on this trial, who watched all of the witnesses, who observed this jury, said that those traffic citations are so minor, I don't think this would have altered anything. And I think that finding is fully supported by the record and does not justify a new trial. How about the voir dire questions? On the voir dire questions? The presumption of innocence. Correct. The burden of proof and all that. And what Judge Mossman did there. You know, the effect on the jury's mind of the failure of the defendant to testify. And unlike the people in the Hearst survey, this jury was educated. Judge Mossman at the very beginning of the trial instructed them on the presumption of innocence. What do you mean? The burdens of proof. This jury was sworn and then given instructions about the presumption of innocence before the start of the trial. But the question is, why do you ask them about whether they'd follow the or allow government to ask whether they would follow the narcotics laws and not allow the defense to ask whether they'd follow the presumption of innocence and reasonable doubt and all those things? I mean, I can understand your argument, if you would say. They were instructed in these things. So there's no reason to have voir dire about what they're told they have to do. But why voir dire on one and not on the other? In part, I think it's standard practice. The judges in this district have a standard set of questions that they ask. They then modify those for the particular case. Here, he asked about drugs. He also asked about race at the defendant's request. I think what is problematic about asking these kind of open-ended questions, such as were suggested here by the defense counsel, is that we don't want the jury to get too talkative in terms of tainting the rest of the jury pool. Judge Mossman knew that he was going to be giving them specific instructions, that, in fact, they were not free to disregard the law on the presumption of innocence. But why did he give the instruction on the narcotics law? Why did he get into that part of it, on voir dire, on the narcotics law? Because it was requested. Well, so was the other request. So was the other. I think narcotics laws raise, particularly in cases involving marijuana, particularly in the state of Oregon, there is a concern about people who disagree with drug laws. And so it's not uncommon for that question to be asked. Voir dire, though, is uniquely within the province of the district court's discretion to tailor the questions. But it's got to be fair. And they were fair here. They were fair particularly in light of the preliminary instructions and final instructions that were given. And, in fact, the defense counsel, this is at SCR 26, asked one of the jurors, do you understand that the defendant here is starting with a clean slate? And the juror answered yes. So that point was, in fact, established during voir dire. Unless there are others. Which was minimized by the stipulation that he was, in fact, a convicted felon. The jury was not told how many convictions. They weren't told the nature of the convictions. Well, why did they have to? I mean, you've got him and, oh, here's this parole officer. It's like, well, we're watching this guy all the time, you know. Why did the government have to bring out that he was a parole officer? To establish why it is he would know about the defendant's employment history. You could have just asked the defense counsel to stipulate to that fact? To stipulate to the fact that he had no record of employment? Whatever it was you were trying to get at. The limited purpose of Mr. Green's testimony was to establish that the defendant had no record of employment. And so, therefore, since he was found with $690 in cash on his person. Okay, so he could have stipulated with defense counsel that there was no record of employment. That's all you need. We didn't have that stipulation here. Well, did you ask for it? That's not in the record, Your Honor. I don't know if we ever requested it. I can tell you that we had no stipulation, and so that's why. Well, when you put someone up and stand and you say, are you so-and-so's the defendant's parole officer, that's going to bring in negative vibes, right? Right. But we also know that it has happened before. In the Beck case, in some of the other cases that we've cited to the court, there are times where police officers come in and testify. They identify a defendant from a surveillance photo. Its admission, although it raises the specter of prejudice, is not necessarily error. And it certainly wasn't error here, where we've got the 922G charge and the defendant's stipulation that he is, in fact, a felon. I see that I'm out of time, unless there are questions about the sentencing. You know, the best way to try a case is do it clean and right and fast. And, Your Honor, I believe that was done here. And, in fact, I think the jury's verdict reflects the fairness of their consideration. He was convicted of the 922G felony possession. He was acquitted of possession with intent to distribute and acquitted of the 924C charge. Mr. Price received a fair trial, and his judgment of conviction and sentence should be affirmed. Thank you. Thank you. Your Honor, if I could just have a minute. The government pointed out that Judge Mossman made a finding that the trial attorney, Mr. Walker, would not have changed his strategy had, in fact, the license plate violations and the fraudulent license plate violations come in or had he been permitted to cross-examine under 608. Pull the microphone a little closer. Well, that's not the case. The judge made that finding, but that's clearly not supported by the record because the trial attorney testified at the hearing on the motion for a new trial. He also filed an affidavit. He said quite clearly and directly that his entire strategy would have changed, that Antoinette Phillips, contrary to the government's argument, was the key critical witness in the government's case. She was the only witness who, according to her testimony, had actually seen the defendant arguably in possession of a gun about 20 minutes before he entered the car. There were four people in the car, any one of whom could have possessed that gun. It was Antoinette Phillips who said about an hour or half an hour before, I think I saw something that looked like a gun in the defendant's possession. So she was a critical witness. And Mr. Walker testified at trial that had he known about this impeaching information that Judge Goodwin referenced with the license plate violations, which portrayed her in an entirely different light. The jury got a completely warped view of her character in the first trial as opposed to the second trial. The government's withholding of the Brady evidence caused the jury to see Antoinette Phillips as just a person, not knowing, in fact, that she was a person who completely was a scofflaw, who disobeyed prior orders, who didn't care about anything and who probably didn't care about taking her oath. At least this was what Walker could have argued, and he said he would have argued it. He wouldn't have just argued that she was mistaken about the gun. He would have attacked her credibility, as was done by the second attorney in the second trial, which led to the hung jury. What was the other evidence that the government introduced to connect your client to the gun? Well, the only other evidence was, as the government stated, it was circumstantial evidence relating to events in the car. Supposedly the- Bending over. Bending over. But as Judge Reinhart pointed out, he was on parole, he had marijuana, and there was a warrant out for his arrest. He had every incentive to try to get out of that car, having nothing to do with the gun. But there were four other people with the gun. Yes, he was seen by the officers to make furtive moves. Were there any fingerprints on the gun? No. No fingerprints on the gun. So this Antoinette Phillips was the critical witness, and in the closing argument, the government highlights that Antoinette Phillips was an important witness in the case. If there are no further questions, thank you very much, Your Honor. Okay, the matter is submitted. We'll take up the last case, Lemons v. Bradbury. And in the Mathis v. Estate Recoveries, that submission is deferred. It's off the calendar.
judges: Goodwin, Pregerson, Reinhardt